Thank you, Your Honor. Robert Jaffe for Viraj Profiles. We list a number of errors on appeal in our briefs, but in this argument I want to focus on two points. Why Organic Kimye is different than this case and that the length of remedy is unsupported in the record below. Organic Kimye involved spoliation on a scale described by the court as wholesale destruction of primary evidence involving a number of issues. Clear evidence of deliberate intentional destruction, the opinion at 997. The court knows from the opinion issued by the other panel there were three laptop computers, one was overwritten 108 times. Further, software was used to check it 12 times. Forensic software was used to see if anything was left. The second computer's hard drive was taken out, hit with a hammer, something that could not possibly be done in the ordinary course of business. Their laptop computer was accidentally supposedly lost at a rest stop. In our case, we have the installation of a single operating system on a single laptop, something done in the ordinary course of business. What difference does that make? The intent, the requirement in my crime for it that you need to have the intent to destroy evidence and the intent to prejudice the other party cannot be shown by a single act of maintaining a computer, something that can be done in this widespread destruction with direct evidence, in fact, admissions in the organic record that it was done to deprive the other side of evidence. And here you have the simple loss of one computer's worth of evidence. You have a finding of bad faith. Well, I don't believe you can find bad faith without some plus factor. Micron says that you cannot find bad faith from the mere destruction, even the intentional loss of evidence. So you're arguing for clear error on that finding. I'm arguing that it's clear error, that it would be an abuse of discretion because it would be outside the scope of the law, the circuit for them to impose that sanction. Even though the computer was wiped right around the time that the litigation was filed or discovery requests were coming in or some key dispositive date, and you're leaving out the fact that there were apparently some 30 or more USB devices that had been attached to this computer at one point or another, and you couldn't locate a single one of them. Couldn't locate them, but there's no showing they were destroyed, let alone intentionally destroyed. And what Micron teaches us is... But you can make an inference of bad faith based upon the timing, on the fact that the stolen file was on, a reference to it was on the computer, and that you failed to turn over anything relating to this, particularly the timing of the suspect operating system upload. Your Honor, it's our position that that inference would be a clear error, not meeting the Micron standard of clear and convincing evidence of bad faith spoilation and of prejudice, and that the must show they intended to impair the ability of the opponent to proceed. And do we look at that in isolation or in the fact that one of your company's employees was convicted in an Italian court of stealing trade secrets? Your Honor, I think I have to split that in half. Obviously, we're not going to ask the court to parse each piece of evidence and find it insufficient. So you think we can't look at the course of conduct of this company, which intentionally tried to get an employee of your competitor to steal data, was convicted in Italian court. That employee, I think the record shows, met with the person whose computer is at issue here. I know you may disagree with that, but it seems like that was at least one of the facts we relied on. We can't look at any of that. We just look at the, in your view, accidental timing of the operating system upload and the accidental fact that you can't find more than 30 USB devices that were used with this computer? Your Honor, I think two points on that. I think you can look at the whole concept. If we were arguing there should be no default on any issue, that we should go unpunished, I think the course of conduct would be much more important. Our argument here is that they should not find a sanction. It's not that we are, there was not. Well, I thought we were talking about the bad faith inference. Right. I mean, in the bad faith inference, if we get a look at the whole course of conduct and the fact that you were convicted in an Italian court of conspiring to steal trade secrets, that would seem to support an inference of bad faith of wiping the computer's memory right around the time this litigation was filed. I believe, Your Honor, you're taking bad faith in general, which I think is inappropriate. What my crime requires is evidence of bad faith spoliation, intent to impair the ability of the opponent to proceed. Every trade secret case involves a misappropriation of trade secrets. The person there has acted somewhere contrary to law. Well, what do you think the ITC should have done? I think the ITC, I think Judge Essex should recommend the ITC should have adopted sanctions relating to the issue where the spoliation occurred, receipt, and the further inference, which goes beyond the direct evidence shown, use of the trade secrets. We should have been foreclosed from that because Micron further tells us, in the other cases we cite in our brief, that even when you find this, you give a remedy that is sufficient. I think you go too far. I mean, are you talking about the length of the exclusion order here? What are you talking about? Two different points, Your Honor. The length of the exclusion order is a separate point because it's not record-based. We say the default is too broad because it goes to the issues not related to the receipt and use of the trade secrets. It goes to the scope of the domestic industry, which is something that Barrage would never have evidence on. And it goes to the questions whether the operating practices that were found and despoiled were even trade secrets. In lieu of default, to answer Judge Dank's question, what remedy do you think the ITC should have adopted? I'm sorry. We should be foreclosed on the receipt and use question, and the rest should, in conformity with the general rule of resolving cases, resolving the merits. The domestic industry requirement, what else? And whether the operating practices were, in fact, trade secrets, or as the expert evidence shows, they were basically publicly available and not very valuable to Barrage. I think it's also important in bad faith and doing proportionality, because bad faith is not the only thing, that the Organic Kimye violation was a direct obedience of a court order. And certainly the upgrading of the computer, the operating system was installed before. There was not any order, it was only our general duty to preserve. I'd like to go to the point you mentioned about the length of the remedy, because that's a totally, I believe, separate issue. In Organic Kimye, the complete default was upheld based on the pleadings in the case, but the court required, and heavily relied on, that the 25 year period there was supported by record evidence. And the court said that over, and over, and over again, that the commission decision finds ample support in the record. The length of the exclusion order depends on the evidence in the record. The record in this case supports the limited exclusion order. There is no record evidence in this case supporting 16.7 years. There's a single allegation in the complaint, which we believe on the exhibit we showed you is not well based. It's for the entire use period, an average time for the entire use period, dating back to 1942. The time period clearly in violation of the syntax standards, you must show that period is actually used, it would be necessary to be used for development. If you take just the time that even Val Bruna's secrets from that same exhibit were done in the 21st century, starting 2001 to 2006, you isolated those trade secrets, you'd find the time for their so-called development period, which the ITC describes as the period starting with the first manufacturer of that grade of stainless steel to the current time, current time being 2006 when the exhibit was prepared. That modern period is 2.7, 2.8 years. In the current time, with Raj being already established stainless steel manufacturer, with having modern equipment in place, with it not taking in the 21st century more than perhaps weeks or months, but certainly not more than years to develop any grade or multiple grades of stainless steel, there is no support in the record, which is required under organic Kimye for the 16.7 year period. You have an allegation of how long Val Bruna took from the time it first developed it to the time it brought the complaint, totally fails the syntax standard, which rejected the amount of time claimed by the plaintiff, because it may well not have all been necessary and may well not all represent a true development period. We think that is a separate error that goes that even after a default, even after the default, you cannot get to the length of remedy that the commission imposed. What they cite in the record, the five questions and answers we show in our brief, just say many years. Just say practices had been developed or research and development had been used for many years of trial and error. No particular period in time, in fact their witness said they did not keep those sort of records. They could not tell you from their records what the actual development period was. Your rebuttal time, do you want to say anything? Thank you, your honor. Ms. Nayala? May it please the court, if I may start with the default sanction since that lays the foundation for the commission's remedy determination. Let me ask you a couple of questions about that. First of all, I am not terribly sympathetic to the notion that the question of whether this was a trade secret should not have been within the default, which is one of the arguments that Mr. Jaffe made, but he talks about the domestic industry finding and he says that the default should not have extended to that and perhaps there is an issue there as to whether there was a reasonable possibility that the material that was destroyed would relate to the domestic industry or not. Could you address that question? Right. The problem is that we don't know all the exact volume or contents of the information that was destroyed and missing. It could have very well, though the USB devices that were lost could have contained potentially thousands of files and they could have related to the domestic industry and certainly the market that existed in the United States. How is the domestic industry issue usually determined? What kind of evidence? If you are looking for injury or threat of injury, of substantial injury to the domestic industry. So, if there is any information That sounds as though you would look more to the competitors of the accused infringer rather than to the accused infringer's own conduct. The domestic industry could be established based on the complainant's evidence or evidence that could exist in the respondent's files. That information is not irrelevant simply because it is in the respondent's possession. The problem is that we simply do not know what information Barrage had. They certainly considered the information from Barbara special because they exerted a lot of effort to coordinate with Mr. Zalsa to misappropriate the trade secrets and to continue using them throughout the investigation. The commission here... Am I correct that the scope of the trade secrets in question would have an impact on the scope of the domestic industry inquiry? The scope of the trade secrets themselves, no. It more goes to the fact that it is completely unknown what information that Barrage had in its possession and what it destroyed from Ms. Mather's computer and Ms. Mather's files who was the head of Barrage's research and development in quality insurance. And the administrative law judge found here that any information that was in her possession was highly relevant for Valbrunna in proving its trade secrets claim, which includes all the elements here. That's fairly easy to understand, but the question about impact on domestic industry is a little more tenuous. I don't believe there's any requirement, if it were necessary for the stolen trade secrets or the spoliation here to be related to each element of the case. I think that would defeat the purpose of default. We would have to be looking to the merits of the respondent's case, and I think that would defeat what the purpose of default is here. Let's turn to the length question. It seems to me very dubious that the ITC can refuse to address the length question on the merits, the remedy, because of the default. Typically, in district court proceedings, once there's a default, the amount of damages or the remedy is still open, it's not foreclosed by the default. And why should the ITC be any different? The ITC is different because the type of remedies are different. That's true, but why does that make it different? It makes a difference because- Why is it the default to have a water scope before the ITC than in district court? The commission rules specifically allows the commission to consider default and to consider factual allegations presumed to be true in determining what relief to issue against a respondent found in default, and that's found at Commission Rule 210.16c1. The rule doesn't say anything about the default extending to the remedy issue, does it? That provision specifically is a provision that specifically addresses default. It starts off with relief against a respondent in default and specifically guides the commission in making its remedy determinations against defaulting parties. And that's the rule that was applied here. Where is the language of this rule? You can find it 210.16c1. 210 what? What page of the appendix of the briefs? It's a commission rule, it's 19 CFR section. I don't have the entire CFR here. Did you cite it in your brief? Did you quote it in your brief? It is cited in our brief, but we do not quote it in its entirety. But I can read it to you, Your Honor. Section C starts off with relief against a respondent in default. Section 1, type of relief available. After a respondent has been found in default by the commission, the complainant may file with the commission a declaration that is seeking immediate entry of relief against the respondent in default. The facts alleged in the complaint will be presumed to be true with respect to the defaulting respondent. The commission may issue an exclusion order, a cease and desist order, or both. And so that's the rule that was applied here and cited by approval by the Supreme Court in our guaranteed opinion. Well, that seems to me not entirely clear and I'm a little skeptical that the commission has greater authority to extend the default to the remedy than the district court does. But let's talk about what evidence the commission relied on because the commission did say even if we didn't extend the default to the remedy, there was still evidence that supported this 16-year period. But the evidence is just the period in which the patentee was, or the holder of the trade secrets was manufacturing the product. That doesn't seem to really be very good evidence of the period that it would take someone now to develop the trade secret. It's important to keep in mind the nature of the trade secrets here. These are not, the trade secrets here are not the stainless steel grades themselves or the process for manufacturing. But answer my question, why is the period of manufacture really pertinent to the length of time that it would take to independently develop the trade secret? The evidence is not simply the time that Bob Bruno spent manufacturing the grades. The 16.7-year period is the average time including all processes. So you agree that the manufacturing period is not very probative? No, and that's not what the evidence, that's not what the commission's decision. Yes, you agree. I'm sorry? Yes, you agree. I agree that it's not simply the manufacturing, it's the process. Okay, so what other evidence is there? The development period here includes all process improvements over time. And the evidence shows that Bob Bruno spent an average of 16.7 years for over 300 operating practices of continuous trial and error, thorough research and development, and incorporating the feedback from various departments at Bob Bruno and its customers to maximize efficiency and to obtain consistent output for high-quality steel. That's true, but why does that establish how long it would take to independently develop the trade secret? It is evidence supporting the commission's finding as to how long Raj would have spent developing the same trade secret. Is there any other evidence? That's the evidence that was before the commission. So there was no expert testimony that would take such and such a period of time to develop the trade secret? There is no expert testimony here, but expert testimony was not required. Raj also did not provide expert testimony as to how long it would have taken to develop Bob Bruno's operating practices. It simply pointed to evidence as to how long it would take to manufacture its own grades. And it made no connection to its proposed period of six months to two years to how long Bob Bruno spent developing its trade secrets. Maybe you need a better record from both parties. Well, that's what happens when evidence is destroyed early on in a case. And Raj should not get the benefit of having destroyed evidence in bad faith. And I would also like to mention that Raj did not challenge bad faith in its briefs and raise it for the first time in oral argument today. And the record here contains ample evidence that Raj had acted in bad faith. Okay, any further questions? Thank you, Ms. Nakayama. All right. Thank you. Mr. Menser? May it please the Court. I'm Stephan Menser and I'm here for Val Bruno, the intervener. Your Honor, I want to address a question which has to do with the duration of the remedy. I think it's an important consideration. And it has to do with the evidence that the Commission had before it. Your Honor discussed the evidence of Val Bruno's independent development time. I think what we all have to realize in the background is that there is missing evidence on the question of independent development. Viraj exfoliated that evidence. And to the extent that there are questions... Wait, wait, wait. Exfoliated the evidence as to how long it would take for development? What's the evidence of that? So the evidence of that is that Viraj, if you look at the assets, the electronic assets, they were in the possession of Shilpi Mathur. Shilpi Mathur is the head of research and development at Viraj. She's in charge of developing new grades of stainless steel. No question but that they destroyed evidence. But you made a statement. You said they destroyed evidence of the time that it would take to develop the trade secret independently. I don't see what the basis for that is. The basis is that the evidence that was destroyed is research and development material. It's on her computer, on her USB drives. We, of course, don't know what was destroyed. But we can reasonably infer that as the head of research and development, she has access to materials that involve research and development. I can cite to a specific example in the record, Appendix 2, 2755-59. This is the fragmentary information we get from the forensic inspection, is that she accessed the Valbrunna trade secrets from a USB drive, and it was sitting in a folder that was named important R&D file for project. So she's involved in the research and development process. Her materials are evidence of how long it would have taken Varosh to develop steel and the trade secrets themselves. She, in fact, is accessing the trade secrets in the course of research and development, is what the record shows. So we're talking about a spoliated fact record. Makes it difficult for the commission. Suppose you put that aside and say, well, we have to apply the same rule to the ITC that we apply in district court, and the default doesn't apply to the question of remedies. Suppose we were to say that's the right rule. What evidence is there to support the commission's remedy determination? The evidence to support the commission's remedy determination is the evidence of Valbrunna's development time of the trade secrets. It is appropriate to look at the trade secret owner's time to develop the trade secrets. It's what the commission did in rubber resins, it's what it did in crawler cranes, and those were affirmed by this court. We're talking about the process of development of the stainless steel. The way it works with the stainless steel is that this is a process of incremental development over long periods of time. But the fact that the trade secret was developed over a long period of time hardly supports the notion that if someone were trying to independently develop it that it would take the same period of time, right? I think, Your Honor, we struggle to find the exact precision, but we're not required to find the exact precision in light of the spoliated fact record. We go with what we have. You keep coming back to the spoliated fact record. Put that aside for a moment. Understood. Suppose that the commission has to make an independent remedy determination without regard to the spoliation, which may or may not be correct, but let's assume it for the moment. Right. It seems to me that all you have is evidence of the period that it took the trade secret holder to develop the trade secret. That's a generous reading of the record. That doesn't really show the period required for independent development, does it? Well, Your Honor, we have more evidence than just the 16.7 years. We have Nikola Avgisi, who's head of the melt shop. He gave testimony, which was presented to the commission, on how Valbrona actually develops these operating practices, that it tests the grades of stainless steel as they're made, gets feedback from customers, and throughout the process of the melting and the casting and the refining, these improvements are built back into the trade secret. So that's at Appendix 4052 to 53, Appendix 4063 to 69. Mr. Avgisi gives specific examples with respect to an operating practice of chemical composition changes that happen. Sure, but that's still evidence of the development period for the trade secret holder. Absolutely, and that is appropriate evidence of independent development. The question is, it is evidence which bears on the question. The question is whether that evidence alone is sufficient. I'd like to point, Your Honor, to actually another piece of evidence that we were able to obtain from the forensic inspection. Again, I know we're not discussing the exfoliated evidence because we don't have the exfoliated evidence, but the forensic inspection was able to pull out certain information. We do know that Varage accessed one of Valbrona's trade secrets. This is the AIM-1 operating practice. The AIM operating practice was accessed in 2015, I believe. Varage first started melting the grade of steel that corresponds to that operating practice in 19 years earlier. So we have the evidence of Varage melting the grade of steel at a certain time and then accessing the operating practice that matches that. That is actually evidence of Varage's development and reliance on the operating practices, but also the development time it took. If it had fully developed the stainless steel, it wouldn't be accessing it 19 years later. The record sites for that are 319- I'm not understanding the point. I'm sorry. Okay, let me try that again. So Varage starts melting this grade of stainless steel, grade 201 stainless steel, and it does that- They start producing that grade of stainless steel. Exactly. They start producing the grade of stainless steel in 1995. That's at Appendix 4896. We know that it accessed Valbrona's operating practice, the AIM-1 operating practice, 19 years later, accessed it in December of 2014. That's at Appendix 2757. So you have a 19-year period between when Varage first makes that grade of stainless steel and it's accessing the operating practice. Are you saying that they wouldn't have needed to access the operating practice if they'd already known how to do this grade of steel? You're asking us to draw an inference from something that doesn't really seem to have any kind of firm evidence one way or another. I mean, maybe they were just looking at all the various practices. I mean, when you steal somebody's trade secrets, I assume you just look at everything you stole. It may not have any bearing because you may have already figured it out. So I'm not sure how much weight- I mean, I get your theory, but I'm not sure how much weight it really has. Well, it really goes to the question of corroborating the 16.7 years. Again, the backdrop of this is we have a spoliated fact record on independent development that Varage spoliated. What do we have that's left to determine the development period? We look at Valbruna's development time, and we have testimony saying that it's an incremental process over long periods of time that's unroboted. And we have evidence from the forensic inspection that corroborates that. That's the only thing that corroborates the- In these types of cases, what evidence other than the developer of the trade secrets and its competitor who stole them would you use to develop an independent estimate? Your Honor, you would look at just the nature of the industry, to be honest. I think you would look at it to get an understanding of how the product and the technology is developed in the context of the specific industry. And I believe that's what we did. We looked at the time of manufacture after the trade secret, but also explained through unroboted testimony of how that time is used to actually develop the trade secrets. So it depends on the industry, I think. You can't say across the board. What I would like to have done and be able to do is to look at Varage's documentation and Varage's explanation of how it developed these grades. But we were denied that ability. And in the context of that, the commission's findings as to duration can't be- How critical is that? I mean, certainly in these remedy situations, typically there's an expert, if I understand correctly, who says I'm familiar with the trade secret, I'm familiar with the industry, and this is my conclusion as to how long it would take to independently develop the trade secret, right? And in order to do that, you don't necessarily have to have access to the information that the misappropriator has, right? Your Honor, we have had a metallurgical expert who was tasked with looking at the production of Varage. But, again, he can't opine on things on information and evidence that he has denied the access to. We can't be put in that position. But did he testify that he couldn't opine on the length of the required development period without access to the information? Your Honor, I don't believe he testified as to that point. But I would like to bring this back to the organic kimia decision. When we look at the overall context in terms of a default decision and the remedy, we have to also consider really the deterrence factor here. You know, it would be nice to be able to have perfect precision to calculate every single- That case didn't say that the default extended to the remedy, right? Yes, Your Honor, correct. But it does say when we evaluate whether to award a default sanction, you consider the deterrence factor. And I think it also bears on the question of the calculation of the remedy as well. It cannot be the case where a party like Varage deceives the court, lies to the parties, consistently does so, destroys crucial evidence in the case that hits multiple areas and hits multiple elements of the violation, and then is permitted to go to a trial on questions like domestic industry and go to a trial on questions of the precise development term. The commission has discretion, broad discretion, to set the terms of the remedy based on the evidence that is available. In district court, the defaults don't extend to the remedy. Your Honor, I don't know if we need to reach the question of default extends to remedy because the commission didn't automatically extend default to remedy. But the commission rules do say, that's 210.16, say that a defaulting party has waived its ability to contest the allegations in the complaint. Moreover, the commission rules also say that the allegations in the complaint are presumed to be true. They're presumed to be true. These rules have to have meaning and significance. And Valbrunna's allegation as to 16.7 years has to be presumed to be true, and it is corroborated by the evidence on the 19 years that it took Varage to continually measure. So I get back to you in light of the ‑‑ I think we're out of time. Oh, thank you, Your Honor. Thank you, Mr. Minister. Mr. Jaffe, you've got less than five minutes. Thank you, Your Honor. I believe I have about four minutes left. If I could just make a couple of points quickly. The domestic industry issue is completely separate from anything that Varage would know. I heard ITC counsel say, well, the missing evidence could have been this, could have been this. That's not enough of the standard of the Micron. You need a plausible showing that it was evidence that would be prejudicial. We would agree. Missing evidence could be anything, but that Varage would have, the only evidence of the scope of what Valbrona produces in the United States is not plausible. But, I mean, it's not exactly unusual that in the misappropriator's files you would have, for example, e‑mail saying, well, we better steal this trade secret because it would take us 10 years to develop it on our own. There could be evidence like that. There could be evidence as to length, and I was trying to go to the scope of the domestic industry, and I'm sorry if I confused those two issues. On length, we agree with the court's questions that length must be proven, as in the district court on the record, and the point is that's exactly what happened in Organic Kimye. They accepted a complete default, but to impose the length of remedy, they went to the record. They had expert testimony. They found it would actually, the actual period it would take Organic Kimye to have recreated Dow's things was 25 years, supported in the record, something the Anomalies said that they emphasized. That is the law. That is the law that should apply to the ITC. The circular reasoning that if you have a default, it has to be to all issues, and therefore you don't get to challenge it doesn't really get, I think, the government anywhere. The bad faith, just quickly, was raised in our brief at 12.13, showing without the intent, you don't have the bad faith, but I think the length is the most important thing. The length, as the ITC described in their brief, is the period from first manufacture to the date of the exhibit. That doesn't meet the syntax standard. Yes, there is some testimony at 40.52. It says many years of trial and error, research and development, developing its operating practices for many years, and that's as far as Alleghese was able to go. The evidence shows that the barrage does not have evidence of the actual development period of any particular grade of steel. Some of this is confidential. I ask you to look at our reply brief, that there was not evidence as to development of the operating practices over lengthy periods of time, and they would not have the records necessary to meet the syntax standard that period of time. They can't tell you. If you come in and told the ITC, we can't tell you what portion of that 65 years is actual development. I think the ITC should not be different on length of remedy, and that it is important that it be proven, especially as to a lengthy remedy, the failure to meet the plausibility standard and the question of showing whether any of this on the other issues, on length and on scope of the domestic industry, could have first prejudiced Valbrunna and secondly could have been the only source of evidence, because if all you're despoiling is additional or repetitive evidence, that is not enough to pose the most severe sanctions. I think that's what I'd like the court to leave the court with. We have the most severe sanction here. The Supreme Court in National Hockey League said it's easy with hindsight to forgive the despoiler. I think it's important to think in hindsight. In a despoilation case, it always involves two elements. Some evidence is missing, and it's missing at a time when it should have been preserved, and we agree to that, and we agree that there should be a penalty. We discussed the scope of the penalty in the opening argument. But with hindsight, especially in the shadow of a gory anechyme, the single thing that is known to be missing and the penalty that can be applied for that more than makes up for any prejudice, the lack of any direct evidence of bad faith or intent to inheed the party, Even if the default sanction can't extend to the remedy, and I'm not all that familiar with what the district court rule is, is there some room in making a remedy determination to adopt adverse inferences or to switch the burden of proof as a result of the despoilation because the despoilation might extend to facts that were relevant to the remedy determination? Your Honor, I see my time's up. I'll try to answer that quickly. When I've been involved in default cases in district courts and trial courts, they start clean. It doesn't matter what happened. They do what they did in Dow. They take evidence and come up with a remedy. Shepard cautions us it's just as bad to impose a too severe remedy, even on a guilty party, as it would be to not allow the innocent party to get the full remedy. This is a court of justice. There's a public purpose to the statute. The remedy should not extend beyond the scope of the actual trade secrets. We ask you to reverse. Thank you, Mr. Shepard. We thank all counsel and the cases submitted.